Arguing in Conflict, Seeking to Intervene in the Society, Mr. Rostuccia, 4 pounds. Thank you. Mr. Rostuccia. Good afternoon. May it please the Court. Eric Rostuccia from the Attorney General's Office, appearing on behalf of the State. I have spoken with Ms. Harrison and reserve three minutes for rebuttal. I'd like to introduce Mr. John Pallas, because obviously we have two cases up for this afternoon. Mr. Pallas is going to argue the Garcia Durantes case, and I'm arguing Ambrose. As this Court may recall, that we were together three years ago, Mr. Hall and Mr. Jarameta, addressing the computer error from Kent County over the 16-month period of time. Computer glitch created these small disparities. There are three reasons why this Court should reverse. First, there's been no showing of actual prejudice, and I think the easiest basis on which this is by the fact that there's been no showing that the actual composition of the Petit jury itself would have been different as a matter of probability. In this case, we're talking about the missing of one distinct member of a veneer of 40 persons, and as a matter of probability, we're talking about the loss of two members of a distinct group for Garcia Durantes. If you do a probability analysis, there's only a 30 percent chance that the one missing member of the veneer would have been a part of the Petit jury in this case, and there's a less than 50 percent chance in the Garcia Durantes case that that person would have been on the Petit jury. It's the State's position that you don't even get to this test about reasonable probability that the jury would have been less likely to convict if you can't show as a threshold matter that the Petit jury would have been different. Is that like a more probable than not standard, and because we can't find more probable, but isn't the Strickland standard less than more probable than not? Yes, it is. So wouldn't it make more sense to say, well, if the chance of this being a different jury is small, then you've got to have some greater indication that it might have been different. That's a possible way of resolving it as well. What you're doing, it seems to me, is saying, well, it's a 51 percent rule, and you haven't got to 51 percent, so therefore, by definition, it can't possibly meet the Strickland standard, which sounds wrong. Well, and the reason I'm posing it is that we're talking about what jurors might otherwise have done. Very hard thing to know, right? Well, that's true. So the reasonable probability whether a jury would be less likely to convict, it seems to me that's relevant looking at maybe different personnel on the jury, whereas here, the likelihood is that the jury would have been identical, but it's just a likelihood. True enough. But if that's the court's reasoning, which I think is, I understand why I'm only asking for myself. I'm not even deciding. Well, the fact of the matter is nobody knows. Isn't that the reality is that you don't know, none of us know what would have been the result Yes, I agree. It's a very hard thing to know. You'd had one more African-American on the pool. In the pool, that's right. So the answer is nobody knows, so our problem is to deal with the problem that nobody knows the answer to that question. And in fact, if that is the court's conclusion, then it's impossible to know the ultimate burden in moving forward is the habeas petitioners. He has the burden of showing he's entitled to relief. So if there's even equipoise that you really don't know, the habeas petitioner has to be denied relief. But I think in every tort case, the question is what would have happened if you'd been careful and nobody knows? But courts have been making those decisions for generations, reviewing them, and sometimes they're rational and sometimes they're irrational. I mean, so you can't just say, well, nobody knows, and therefore we win. Well, that's not been the state's position. I'm being asked the question. I think if you're talking about in this really in a true abstract way. Who has the burden to prove? The burden to prove is on the petitioner. I think that's clear. But the other component of the analysis, because one analysis Why is that clear? Well, the Why is that clear when the error was made by the state? The 2254 standard under 2254 is that the petitioner has the obligation of showing he's entitled to relief. So the statute places the burden on the petitioner to move forward and to demonstrate relief.  So, but if you want to then take this and then use this as a component of its actual prejudice analysis, that's another avenue of analysis. I agree with, I see that point. But then you'd move to the, what this court called the most important aspect of inquiries, the strength of the evidence. This is a case in which you have a sense This court held. You mean what we held. Right, exactly. I'm sorry. Yes. So then looking at this character of the case, you essentially have two witnesses who are uncontradicted, whose testimony interlocks about the fact that Ambrose committed carjacking, two counts of armed robbery, and did so with a firearm. And the only significant theory of innocence presented at the trial was that this was a drug rental as opposed to a robbery. But of course, the claim that this was a drug rental is belied by the fact that Mr. Anderson's cell phone, his wallet, and his ID were found in the car. Because of course, if it's a drug rental, if I'm getting drugs from you and giving you my car, I also don't give you my wallet, you give me your wallet so I can get my car back. It doesn't make any sense. Does it make sense, however, to, for a court of appeals to defer to the district court on a fact-intensive causation issue like that? No. And the reason I say that is that the court's looking at a cold record. And it's essentially engaging in not taking any testimony. With respect to the credibility determinations for Dr. Summers, yes, I think if there were a question about, we said, it's not credible with respect to this or that. Whereas if we're looking, what the court had asked the district court to do was to take a look at the transcripts and give it a careful review. But this court is equally capable of reading a transcript and making a determination about the strength of the evidence presented at trial. Counsel, let me ask you this. If it were clear that this is a cross-section Sixth Amendment right to jury error, constitutional error, if it were clear, would there still be no prejudice? Yes. I think that the question of prejudice is independent of the issue of whether there is a fair cross-section violation, although I resist the conclusion that there is a fair cross-section violation. No. I'm just asking hypothetically. No. So the answer to the question of prejudice has to demonstrate, even if there had been a categorical exclusion of a distinct group, if we know as a matter of law that there's no way it could have affected the verdict, there's no way they could have been on the pettit jury, that we really would have had no bearing on the actual outcome of the case. You could have a fair cross-section violation without there being prejudice that excuses the cause of prejudice obligation. Constitutional error without there being prejudice. Now where do you, what law do you support? Well, that's really the framework that this court has established within Ambrose itself. We didn't reach the merits. No, you didn't. But the question of whether you have to show actual prejudice or not is not, you don't demonstrate actual prejudice by showing a constitutional error. You show- Where is the law that says that? In Ambrose itself, it says you have to show that there's a reasonable probability that the jury would have been less likely to acquit. That's a different inquiry than whether there was a constitutional violation. That's clear, it seems to me, from this court's prior decision. It's not clear to my, in my mind. Well, I would- I mean, when we don't decide something, we don't decide it. Well, then I think the standard wouldn't have been there's a reasonable probability that the jury would have been less likely to acquit. The standard would have been whether there was a constitutional violation on the merits of the question. But that's not the test, and it would essentially subsume. The question is- So if it were clear that there were no constitutional violation- It could have been prejudicial, and there could be no constitutional violations. That's another possible conclusion this court could reach, which is- If it were clear that there were no constitutional violation, how could there have been any prejudice? You could have a prejudicial error without- I mean, as a theoretical matter, I think they do dovetail. The analysis runs- I think the analysis runs together, not against each other. So if you don't find a constitutional violation, the likelihood of finding prejudice seems very low. I think as a theoretical matter, they're not logically interconnected. But it does make me- I mean, to move to that point on the question of the fair cross-section violation claim- Before you do that, I want to hear your second and third points for why there was no prejudice. Well, the first point was- You got the first one. We got past that. And what are the second- Well, the second was the strength of the evidence of the case. That was the second point. Do you want to address that? Or you did? Okay. Well, I did. I mean, I can go through the detail of the testimony. Oh, that's fine. I just wanted to make sure you- Can I just ask a question on the strength of the evidence? Sure. Absolutely. And then I want you to give your third point. I hear what you're saying about the wallet, et cetera, but isn't it equally strange that someone robs a car, robs people at gunpoint, even takes chains off their neck, but then leaves a wallet, a watch, and two rings, and a cell phone in the car? The things that were left in the car were the empty wallet, ID, a couple of rings, and some other jewelry. The inference I've drawn is that the jewelry itself, the things that were taken, not the things that were stolen from the victims, but the things that were left were just of no value. Just what? They were things of limited value. Because the things that they stole, the chains that were taken from Mr. Anderson and Mr. Morgan were taken and not recovered. So the idea that somehow the things found in the car cuts against the prosecution's theory of the case. It doesn't. So the first point was actual prejudice, the strength of the evidence. I should make one point about the testimony of Professor Summers. I think this court, however it rules, should repudiate the conclusion that in every case in which there is a missing African American member of the veneer or from the pedigree, that that's always prejudicial. I think that runs exactly against the way the United States Supreme Court has examined and ruled on Batson challenges, just Thurgood Marshall's analysis that we don't stereotype. I mean, it seems to be the opposite conclusions. And also his testimony itself contradicted in two significant ways this court's analysis in Ambrose saying that the mixed race case is the only case in which we're not concerned about possible effects on jury deliberations based on race. And also saying strength of evidence. The idea, it's an interesting idea, is the idea that even if some social scientist could somehow prove, however social scientists prove things, that blacks are more likely to convict, that that's just not a constitutional, that constitutionally we just can't take that into account. I don't think the court should. The reason we can't is because, I mean, we can't control what social scientists say. I mean, it's just that we can't come to that conclusion because it leads to policy choices that are constitutionally suspect. It would be constitutionalized racial stereotyping. It would. Think about Asian-Americans. Let's say that they're more likely to quit than whites. And if I were striking Asian-Americans, there would never be prejudice because, of course, it makes it more difficult for me to prove my case as a prosecutor. It's very troubling. It's very troubling. So coming to the last point, which is the third reason this court should reverse, is the fair cross-section point. I went through all the, you know, I put that two-page with all the tables and other circuits. No circuit has found this level of absolute disparity and comparative disparity to be sufficient to find a fair cross-section violation under the second prong, fair and reasonable, except for two. Those cases don't all have, are those Sixth Circuit cases? They're all over the place. But the Sixth Circuit. But we've got precedent, right? True. But here's the point about the two cases that are run the other way, which are Jackman and Smith. They both found non-benign factors. And the point of that Smith case is if you have non-benign factors at play, you have a sliding scale. And so in Smith, the conclusion was... You mean intention? Well, it's just bad will. There's been no showing of bad will here. Those cases are distinguishable. It wasn't an innocent mistake, is what you're saying. It was a hidden error, as this court noted in Ambrose itself. It was something that was not detectable. And once detected, it was corrected. And so if you separate and distinguish Jackman and Smith, there's no case in which these small disparities have been a basis for relief. Think about the concept of one missing veneer. A person from the veer would be a basis for relief. Seems implausible. Thank you. Good afternoon. May it please the Court. Brad Hall on behalf of the Petitioner Appellee, Mr. Joseph Ambrose. With me at counsel table is James Jarametto from the Federal Defender Office in Detroit. I would like to begin, I think, by confronting the first opinion. I'll call it Ambrose 1, because I think we'll all be calling it that maybe someday. You're challenging what we did before? Well, I think perhaps some of the assumptions that underline the Court's analysis in that case, with all respect, may not have been accurate. And so... If you would, tell me when you stop challenging what we did before. Well, whatever the Court does now, it has to account for what happened before. And so I think a big challenge for me and a big challenge for the Court is explaining a decision here that is consistent with what the Court said the first time around. And I think the Court should admit the tension, and this isn't included in the first opinion, but the Court should admit the tension between the United States Supreme Court line of cases saying that it is impossible to quantify actual prejudice from structural errors. The Court didn't acknowledge that line of cases. And that is exactly what creates this difficulty here. There's a tension between that line of cases and the line of cases saying that we have to show actual prejudice from a defaulted error. They can't be squared, the Supreme Court... By structural error, what you're saying essentially is that the Sixth Amendment question has been decided by the Supreme Court as a matter of law. That it is a structural error. Yeah, that's what you're saying. Yes, and when I made the argument before, I said that this structural error is just like any other structural error. It's legally impossible to prove prejudice. I was wrong. We now know, I believe we have proven actual prejudice, provided that the excluded group is African Americans. If it had been Asian zip codes, we couldn't prove actual prejudice. And so you get what you just suggested, which is that possibly we have a racially discriminatory procedural mechanism. What do you do with the Smith case? It's from Kent County, Grand Rapids, in which the unanimous Supreme Court said that the disparity there, which was several percent in the same county, was not constitutional error under the Sixth Amendment. That's actually not what the Supreme Court said, Your Honor. The Supreme Court said that with respect to whether it was systematic exclusion, the state courts were not unreasonable to find no systematic exclusion. The Supreme Court did not touch this court's decision on the question of whether the exclusion was fair and reasonable. Reverse this court, right? Certainly reverse the court, and I concede that that opinion is more or less dicta, but it is very persuasive. That component of this court's analysis wasn't touched by the Supreme Court, and here we have greater levels of disparity. To return to where I started, I think that the Supreme Court, as I understand the Smith case, which reversed this court, said that there is no Sixth Amendment cross-section error in this case. Correct. On the merits, there is no violation of the Sixth Amendment, even though there was a significant disparity. Well, the court said that the state courts were not unreasonable to find no Sixth Amendment violation. The Supreme Court didn't say there was no violation, just that it wasn't unreasonable to find otherwise by the Michigan Supreme Court. I think the Smith case teaches us, and all of these cases teach us, is that the Durham factors are sort of in silly order. The court should first make a determination whether or not the exclusion was systematic. Here we have very clear, the state is not even arguing that it's not systematic, so we've cleared the merits. You're on the merits now, right? Correct. Well, I assume we're jumping— I just want to make sure where we are, all right? Under questioning, you've moved to the merits. Yes, I have. There are a few points I would really like to make on the procedural question, too, but when we get to the merits, I think the court should address the systematic question first. There's nothing wrong with doing that. All of these other cases, what you see in the arguments, in the opinions, is that litigants are using statistics to prove systematic exclusion. They're saying, look at the size of this disparity. There must have been something going on in the jury room to cause this. And the courts say no. And what the courts have really done, I believe, is they're issuing opinions about statistical levels that may or may not give rise to a valid claim, but they're doing so unnecessarily. There's no systematic exclusion. Here we have systematic exclusion. The state says, I'm trying to lessen the bar when it's systematic. But the Supreme Court has never said that systematic exclusion, if you want to say that systematic exclusion is—that intent is irrelevant or innocent mistake is irrelevant. They have never said, so far as I know, that that alone is a—constitutes a violation because they also say—they do say that it's a disparate impact type analysis, no question about that, and an in effect type analysis. But after they say that, they say in the Duren case, the only remaining question is whether there is adequate justification for this infringement. Adequate justification. Now, that raises the question about whether innocent error, innocent mistake, which is corrected as soon as they find out about it, is in fact not adequate justification. That is, suppose they had corrected it in two months or six months. The question is whether it is adequate justification for the infringement when there is a mistake that is unintentional or innocent and is immediately corrected after they find out about it. Right? Well, I think your question presumes that fault should matter for these purposes. And I think Justice Thomas has indicated he doesn't think there should be such a thing. I know the Supreme Court says first that fault is not a major factor. Right. But then they say what I just told you. I believe what that statement means is let's assume that there was a reason. But the state has a—I mean, this is a burden-shifting analysis. The state has never attempted to give a valid reason for the systematic exclusion. They've admitted all along it was just a mistake. I don't think that that piece of the analysis has any place here because the state hasn't responded. The fact that they corrected the error as quickly, presumably, as they found out about it, within 15 months or so, not only doesn't help them, but it's a totally irrelevant question of adequate justification? I believe it is totally irrelevant under the existing Sixth Amendment case law. As long as, I guess, we're talking about the merits of the case, this does dovetail a bit into the procedural default and actual prejudice argument that the state is making. In the district court below, and today the state is arguing, that as a matter of probability, a change in the pool, a correct pool, wouldn't have likely changed the makeup of the 12-person pettit jury. It's a lot more probable than not, basically. Correct. And Judge Ludington picked up on that, and he sort of changed the question, but used the same analytical framework to say, well, if we had a correct jury, then more likely than not, we would have had a minority, excuse me, a correct pool, more likely than not, we would have had a minority, at least one minority, in the pettit jury. And in my- How many minorities were in the pettit jury? We don't know. The record doesn't establish in these cases. There's no way that that could have been found out? I suppose if people had known at the time of trial to make a record of this issue, then yes. In one of the cases, there is, because there was a Batson objection, but that's neither of these cases. I raised in my brief- Yeah, it would have been improper to put somebody on the stand and say, do you remember any minorities on the jury? I don't think it would have been improper, but it's an avenue of investigation that we tried to accomplish, and it just wasn't, I don't think there was- You tried to accomplish that and were unable to do that? We weren't able to get solid information either way, anything we could rely on. Memories were- On the question of- How many people actually were on the- No, what actually- No, what the actual composition of the jury- Seemed to me like that would be, if you're talking about prejudice, that would be very relevant. I mean, if there by fluke happened to be three or four minorities on there, you could say, well, they should have had one more, but I think that would have been- In the Curtis Parks case, that's exactly what happened, and we argued this, the same attorneys argued this in front of Judges Gibbons, Sutton, and Moore, and they remanded it, in spite of proof that there were the exact correct number of African Americans on the- Was that a merits or was that a prejudice issue? Well, they didn't say a lot for why they were remanding it, but it would have been completely unnecessary if the panel had agreed that that sinks our claim. And this court said in Ambrose that we should be looking at the entire pool, and the state has made that argument over and over again by relying on Dr. Rothman's- That's on the merits, though, right? You have to- Correct. I think the merits- Well, when you're talking about prejudice, it would seem like you're much more likely to be prejudiced, assuming that these things make a difference with an all-white jury than with a non-all-white jury, or with a jury with 25% blacks, you know? Correct. If the court is going to go down that road, which, again, I think is unnecessary, and now we have the proof that this would just create a procedure, excuse me, a racially discriminatory procedural bar, and therefore- On average, the number of blacks, if any, would have been on the jury, the petty jury, it would be a small number, very small number on the pool itself, but there would have been some on average. My brief argues the disparity of risk analysis. It doesn't argue the disparity. It explains the disparity of risk analysis, and this is a different way of looking whether or not a defect- The answer to my question is no, we don't have no on average? Well, I think we can- I think statistics helps us, and I'd like to explain why. My brief explains the disparity of risk analysis, which is a way to measure whether a defect in the pool affected the makeup of a 12-person petty jury, and this is related and similar to the argument the state is making with respect to the probability of the 12-person petty jury, and Judge Ludington at least acknowledged and entertained. Now I believe this is flawed, and here's why. This assumes that a 12-person petty jury is chosen at random, either from a representative of a veneer or a pool, but what they're saying is that these gentlemen aren't entitled to new trials because if we randomly chose a 12-person petty jury today, it probably would look the same way. But they're not asking for randomly chosen juries. They're asking for a veneer that looks like the community so that they can pick the best jury for them. That's the right that's at stake. The petitioners, the defendants, they have a right to pick a jury just like any other jury. They don't have a right to a randomly chosen jury, petty jury, and so to the extent that the court... You're arguing that there should have been at least one or so black jurors on every jury? No, I'm not. They don't have a right to anything with respect to that petty jury. I think this entire line of argument is misplaced. They have a right to fairness in the veneer, in the 35 or 40 or 43 or 70 people who show up in the courtroom that day for jury selection. That's what the right that's at stake. Now, it's possible to do, and this is not in my brief, but I believe it's possible to do a disparity of risk analysis with respect to the veneer. The problem is that the veneers in these cases are of all different sizes. We have, in Mr. Ambrose's case, we had 40 jurors in the courtroom. In Mr. Wellborn's case, which was with the last trio that was here, there were 70 in a very, in a salacious case. And with Mr. Garcia Durante's case, there were 43 jurors in the veneer. So it's a little bit more complicated. But if the court doesn't invalid about that, though, that's fine. No, no matter the number, it needs to be fair. It needs to fairly represent the community. But we can, statistics allows the court to assess the likelihood that the defect in the wheel, that everybody knows about and acknowledge, changed the makeup of those 35, 40, 43 people in the room. If the court is going to go down that road, that is the better analysis. Now, if you run the, crunch the numbers and do the disparity of risk, you would find that for Mr. Ambrose's jury veneer, he had 40 people. In this case we have. Yes, 40 people. He should have had three African Americans in the room. Three out of 40, 3.2 something. So it rounds down to three. The chance of getting fewer than three with a fair veneer would be 70, excuse me, 35%. The chance of getting too few out of a veneer of 40 would be 35%. That chance jumps to 70. This is the argument that's made in the Judge Ludington's opinion. Well, it's related. Judge Ludington, again, is looking at the 12%. I want you to explain to me why some of that isn't flawed. Because it sounds like, and it sounds very similar to what you're saying, and I'm not sure I can articulate it in a coherent way, but if the, assuming the veneer is 40 people, which it is for the case you're currently arguing, right, with the proper procedures we should expect, but of course it could be anything, we should expect three. Correct. And with the improper procedures, we should expect two or one, right? Not zero. Well. Right? Is that true or not? I mean, if you can say that for the first one, you ought to be able to say it for the second one. We can say, I don't think we can say we can expect two or one. Well, you said yes, you were like this when I said three, but then when I say two, you say, oh no, then it's the same sentence. All we can say is the probabilities. The probability of getting fewer than three jumps. But you say fewer than three, that's sort of cheating, because presumably they had two just as much as presumably they would have had three. And the difference between three and two is one, not three. But then he uses three to say because there's three more than there otherwise would have been, there's a better chance that there would have been one on the pedigree. Do you see the problem I'm having with this analysis? What's the answer to that? The answer, I think, if the court is going to conduct that form of analysis, the answer is to rely on the disparity of risk test, which is described in our brief, and to do it with respect to the entire veneer. In the context of, it's an argument that you put forward, or a technique you put forward in the context of the merits part of the case, but you're saying we should use that rather than what the judge did in the context of the prejudice part, am I understanding you correctly? If the court is going to bifurcate the prejudice and the merits, then yes, that is the better way to do it. Well, you know, we did say to do that in the last opinion, didn't we? Right, I agree. So that's why I was trying to get you, I was trying to start listening carefully once you stopped challenging what went before and moved. Well, I think that's a way to square this, certainly with the prior opinion. And I realize my time is up, but there's an important point I'd like to make about that disparity of risk analysis. If you're going to do it for the veneer, there is a 50% threshold that the Michigan Supreme Court settled on in the Bryant case. Now, they're looking at 12-person pedigrees, not 40-person veneers. I think it should be done with respect to the 40-person veneer. That 50% threshold cannot be met in the Garcia-Durante's case. I guess I can explain that later. But what we have is twice the risk. You should have three African Americans on a veneer of 40. The statistics tell us that the chance of getting fewer than three was 35% with a fair pool. The chance of getting fewer than three jumped to 70% with the tainted pool. It doubled the risk that you're going to have too few African Americans on the veneer. So if the court is going to do that sort of analysis, I think that's the correct way to do it. Thank you, counsel. Thank you. Two quick points in rebuttal. I think the court, Judge Rodgers, I think you've zeroed in on the fundamental flaw of Judge Ludington's analysis. It's the point at which he says on page ID 1426, the question is not how many more African Americans there should have been on a jury veneer, but how many total potential African American jurors there should have been on each veneer. And that's the wrong question, because this is the prejudice analysis. The question is what difference. The veneer had 40 persons. As a matter of probability, there should have been three African Americans on that veneer. As a matter of probability, there were. You're distinguishing between the veneer and the pool? No, the veneer and the pool are the same.  40 person pool. But when the court calls, you have 40 in the veneer, and the court calls 20 into the courtroom from SLAG, that's the veneer? Oh, no. The veneer is the group brought into the courtroom. That's the veneer. OK, well, that's different from the pool. That's true. Yeah, OK. That's true. The pools, but the percentages are the same. I'm going to get an offense point for the whole time. I want to get the lingo clear. There were 40 people brought into the jury room. Right. Exactly right. So of that 40, it should have been, as a matter of probability, three African Americans. As a matter of probability, there were only two. The question is, is there prejudice, because there was one missing African American from that group of 40? Judge Ludington missed the analysis by saying you look at the likelihood of one getting on without looking at the question of what difference it made based on this error. And once you zero in on that, the likelihood that one missing member of the pool of 40 had any real effect on this case is implausible. And if you look at the fair cross-section violation cases in which they provided for relief, Duren and Taylor, the absolute disparities there were 43% and 40%. We're talking about an absolute disparity of 3.45%. They are magnitudes away from each other. This is a fundamentally different kind of posture of this case. Last point, the parks, in reference to parks, there was no analysis in parks for this court to follow. So in other words, on the question of prejudice this court has, it's really the first court to reach the issue. And the court should find that there is no longer prejudice. I must say it's frustrating when you try to balance two competing interests, two competing constitutional interests, and come up and suggest to the parties that they convince the court that there's prejudice when we're not saying there's always prejudice, and we're not saying there's never prejudice. And then when you come back to us, your arguments basically boil down to there's always prejudice, or there's never prejudice. You can see some frustration on the part of the court when that happens. Let me say this, that in the abstract, the test as adopted by the court, the state's position is not that we always win. But if the absolute disparities are this small, there can be no showing of prejudice. All right. Thank you. Thank you. Oh, case will be submitted, and you can call the next case.